# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

## CIVIL DIVISION

| | | |
|---|---|---|
| CATHLEEN CARSON, | ) | Doc. No.: |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| ATRIUM MEDICAL CORPORATION, | ) | |
| GETINGE GROUP, GETINGE USA, | ) | |
| INC., MAQUET CARDIOVASCULAR, | ) | |
| LLC, MAQUEST CARDIOVASCULAR | ) | |
| US SALES, LLC, MAQUET MEDICAL | ) | |
| SYSTEMS USA, PREMIER | | |
| HEALTHCARE ALLIANCE, L.P., and | | |
| DOES 1-20 | | |
| | | |
| Defendants. | | |

**JURY TRIAL DEMANDED**

**Type of Pleading:**
COMPLAINT IN CIVIL ACTION

**Filed on Behalf of:**
CATHLEEN CARSON,
Plaintiff

**Counsel of Record for This Party:**
D. Scott Lautner, Esquire
Pa. I.D. No. 80134

Jeffrey D. Ries, Esq.
Pa. I.D. No.: 311901

McGRAIL & ASSOCIATES, LLC
1714 Lincoln Way
White Oak, PA  15131

412-664-4433

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**CIVIL DIVISION**

| | |
|---|---|
| CATHLEEN CARSON, | ) Doc. No.: |
| | ) |
| Plaintiff | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ATRIUM MEDICAL CORPORATION, | ) |
| GETINGE GROUP, GETINGE USA, | ) |
| INC., MAQUET CARDIOVASCULAR, | ) |
| LLC, MAQUEST CARDIOVASCULAR | ) |
| US SALES, LLC, MAQUET MEDICAL | ) |
| SYSTEMS USA, PREMIER | |
| HEALTHCARE ALLIANCE, L.P., and | |
| DOES 1-20 | |
| | |
| Defendants. | |

### NOTICE TO DEFEND

You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. Your are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.**

**LAWYER REFERRAL SERVICE
ALLEGHENY COUNTY BAR ASSOCIATION
KOPPERS BUILDING, SUITE 400
436 SEVENTH AVENUE
PITTSBURGH, PA 15219
(412) 261-0518**

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**CIVIL DIVISION**

| | | |
|---|---|---|
| CATHLEEN CARSON, | ) | Doc. No.: |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| ATRIUM MEDICAL CORPORATION, | ) | |
| GETINGE GROUP, GETINGE USA, | ) | |
| INC., MAQUET CARDIOVASCULAR, | ) | |
| LLC, MAQUEST CARDIOVASCULAR | ) | |
| US SALES, LLC, MAQUET MEDICAL | ) | |
| SYSTEMS USA, PREMIER | | |
| HEALTHCARE ALLIANCE, L.P., and | | |
| DOES 1-20 | | |
| | | |
| Defendants. | | |

## COMPLAINT IN CIVIL ACTION

**AND NOW COMES**, Plaintiff, CATHY CARSON, by and through her counsel, D. Scott Lautner, Esquire, Jeffrey D. Ries, Esquire and McGrail & Associates, LLC and avers as follows:

## PROCEDURAL BACKGROUND

1. A Civil Complaint was filed in the Alameda County, California Superior Court on June 22, 2014 between a "class" of Plaintiffs and the Defendants named herein.

2. Many of the Plaintiffs resided in different states, including Plaintiff Cathy Carson, herein.

3.  Following a Motion to Dismiss or Stay for Forum Non Conveniens and a separate Demurrer, a stipulation was entered tolling the statute of limitations and staying the cause of action as to all out-of-California Plaintiffs until June 27, 2015.  A true and correct copy of the "Stipulation" is hereby incorporated by reference and attached as Exhibit "A."

## PARTIES

4.  Plaintiff Cathleen Carson resides at 628 Grandview Avenue, Clairton, Pennsylvania, 15025.

5.  Defendant, Atrium Medical Corporation ("Atrium") is a Delaware corporation headquartered at 5 Wentworth Drive, Hudson, New Hampshire.  Atrium is a pharmaceutical company involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including polypropylene mesh.

6.  Defendant Getinge Group ("Getinge") is a Swedish corporation doing business in the United States.  Getinge is a pharmaceutical company involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including polypropylene mesh.

7.  Defendant Getinge USA, Inc. ("Getinge USA") is a Delaware corporation headquartered at 1777 East Henrietta Road, Rochester, New York. Getinge USA is a pharmaceutical company involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including polypropylene mesh.

8.  Defendant Maquet Cardiovascular, LLC ("Maquet") is a German corporation doing business in the United States.  Maquet is a pharmaceutical company involved in the research,

development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including polypropylene mesh.  In October 2011, Atrium announced that it had signed an agreement to be acquired by Getinge and its subsidiary, Maquet.

9.  Defendant Maquet Cardiovascular US Sales, LLC ("Maquet Cardiovascular") is a Delaware corporation headquartered at 45 Barbour Pond Drive, Wayne, New Jersey.  Maquet Cardiovascular is a pharmaceutical company involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including polypropylene mesh.

10. Defendant Maquet Medical Systems USA ("Maquet USA") is a Delaware corporation headquartered at 45 Barbour Pond Drive, Wayne, New Jersey.  Maquet USA is a pharmaceutical company involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including polypropylene mesh.

11. Defendant, Premier Healthcare Alliance, L.P. ("Premier") is a California limited partnership headquartered at 12544 High Bluff Drive, Suite 430, San Diego, California.  Premier operates as a business involved in the research, development, testing, manufacture, production, distribution, marketing, promotion and/or sale of medical devices used for hernia repair, including polypropylene mesh manufactured and marketed by the co-defendants.

12. The true names and capacities, whether individual, corporate, associate or otherwise, of defendants DOES 1 through 20, are unknown to Plaintiff who therefore sues these defendants by such fictitious names.  Plaintiff will amend this Complaint when the true names and capacities of these fictitiously named defendants are ascertained.  Plaintiff is informed and believes, and thereon alleges, that each fictitiously named defendant, whether as a supplier, manufacturer,

distributor, marketer or seller, is responsible, strictly, negligently, in warranty, fraudulently or otherwise, for the occurrences alleged in this Complaint, and caused the injuries and damages sustained by Plaintiff as herein alleged.

13. At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venturer of the codefendants, and each of them, and was acting in the course and scope of that agency, service, employment and/or joint venture.  Plaintiff avers that Defendants are jointly and severally liable for the injuries to Plaintiff, as more fully set forth herein.

## JURISDICTION & VENUE

14.    This action is brought pursuant to 28 U.S.C. §132 based upon diversity of citizenship as Defendants are all situated in different states and/or foreign countries.

15.    This Honorable Court has Supplemental Jurisdiction over the Pennsylvania State Law Claims recanted herein pursuant to 28 U.S.C. §1367.

16.    Based upon the Stipulation of Parties Per Court Order dated April 28, 2015 and filed in the Alameda County Superior Court, Defendants Atrium Medical Corporation, Getinge Group, Getinge USA, Inc., Maquet Cardiovascular, LLC dba Maquet Cardiovascular US Sales, LLC dba Maquet Medical Systems USA and Premier Healthcare Alliance, L.P., have agreed to submit to the jurisdiction of this Honorable Court as the home state of Plaintiff herein.  *See Exhibit "A" attached hereto.*

## FACTUAL BACKGROUND

17.     Hernia, a condition affecting thousands of men and women in the United States each year, is the protrusion or projection of an organ or tissue through the wall that normally contains it.  Although a hernia may form in any part of the abdominal wall, the most common site is the groin.  Groin hernias are known as inguinal or femoral, depending on the location of the hernia.  Another type of hernia is the ventral hernia (also sometimes called abdominal hernia).  There are two types of ventral hernias.  One is known as an umbilical hernia and occurs in the umbilical ring that surrounds the navel.  The other is referred to as an incisional hernia, which occurs around surgical incisions.

18.     Until 1958, abdominal wall hernias were repaired without mesh.  In 1958, Dr. Frances Usher published a medical journal article entitled *Marlex mesh, a new plastic mesh for replacing tissue defects*.  Dr. Usher used polypropylene mesh in experimental canine work for abdominal repair.  Polypropylene is a petroleum-based plastic initially used in the Hula-Hoop and for kitchen storage applications.

19.     Heavily promoted by the medical device manufacturers, including Defendants, hernia mesh, typically made wholly or partly of polypropylene, is frequently used in hernia repair surgery.  About one million hernia repair surgeries with mesh are performed world-wide each year.  Despite the marketing push by mesh manufacturers, including Defendants, to persuade doctors to use mesh in hernia repair, many doctors steer away from polypropylene mesh and use the Shouldice technique for hernia repair.  The Shouldice technique, used for decades, is a mesh-free hernia repair method.

20.     It has been known since 1953 that any implanted device must not be physically modified by tissue fluids, be chemically inert, not incite any inflammatory or foreign body cell reaction, be non-carcinogenic, not produce allergic reactions, and be able to withstand

mechanical stress.  D. Ostergard, *Degradation, Infection and Heat Effects on Polypropylene Mesh for Pelvic Implantation:  What Was Known and When it Was Known.* 22 INT'L UROGYNECOLOGY J. 771-774 (2011)

21.     A typical response to mesh implanted in the human body is inflammation, granuloma formation and a foreign body reaction.  Scar tissue forms around the implant and causes contraction of the mesh up to 50%.  This inflammation, foreign body response and scar tissue formation is a permanent condition and can result in long-term complications.  U. Klinge et al., *Foreign Body Reaction to Meshes Used for the Repair of Abdominal Wall Hernias.*  165 EUR. J. SURGERY 665-73 (1999).

22.     Despite the promotion of mesh as safe and effective by Defendants, the published medical literature contradicts this unsupported belief.  One author observed that "[t]he literature suggests otherwise with reports of various degrees of degradation, including depolymerization, cross-linking, oxidative degradation by free radicals, additive leaching, hydrolysis, stress cracking and mesh shrinkage along with infection, chronic inflammation and the stimulation of sclerosis."   The author concluded, "Based on available evidence the polypropylene used for surgical treatment of various structural defects is not inert after implantation in the human body." G. Sternschuss et al., *Post-implantation Alterations of Polypropylene in the Human.*  188 J. UROL. 27-32 (2012).  As the mesh degrades in the human body, small flakes of polypropylene can lead to infection and irritation and resultant serious pain, as the body tries to rid itself of the foreign material.

23.     Once implanted, mesh contracts as well as cracks substantially in the human body.  In one study, a contracture rate of 30% to 50% was found four weeks after Implantation.

Another study reported an 85% contracture rate after eight years. Nerve fibers are entrapped in the contracted tissue causing severe pain.

24.     A debilitating consequence of hernia repair with mesh is inguinodynia, or chronic groin pain. This condition results from nerves, such as the ilioinguinal, iliohypogastric and genitofemoral nerves, coming into contact with mesh, after its degradation and deformation in the body following implantation, and from the persistent and permanent foreign body reaction to the implantation of mesh. It has been reported that hernia repair with mesh results in an extraordinarily high rate of inguinodynia – in some reports approaching 50%. *See, e.g.,* J.E. Fischer, *Hernia Repair: Why Do We Continue to Perform Mesh Repair in the Face of Human Toll of Inguinodynia?* 206 AMER. J. SURG. 619-23 (2013).

25.     Other studies have found an even higher rate of chronic pain after hernia repair with mesh. One study found that approximately 75% of patients had pain one year after hernia repair at rest, and 78% had pain when moving. B. Page, *Pain From Primary Inguinal Hernia and the Effect of Repair on Pain,* 89 BRIT. J. SURG. 1315-18 (2002)

26.     Despite the abundance of scientific and medical information published in the literature relating to the dangerous properties and serious risks of polypropylene mesh, Defendants made a deliberate decision to ignore these dangers and to aggressively promote polypropylene mesh to healthcare providers and consumers. Defendants misrepresented and concealed from Plaintiff, her physicians and consumers, the serious risks, damages and defects enumerated in this Complaint.

## PLAINTIFF FACTUAL ALLEGATIONS

27.     The hernia mesh implanted in Plaintiff was polypropylene mesh manufactured, promoted, marketed, distributed and sold by Defendants.

28.     The polypropylene mesh caused Plaintiff to suffer permanent injuries, substantial pain and suffering, emotional distress, medical expenses, lost wages and earning capacity and diminished quality of life.

29.     Before Plaintiff underwent hernia repair surgery with polypropylene mesh, she had no history of these physical and emotional injuries.

30.     Plaintiff has filed this lawsuit within the applicable limitations period of first suspecting polypropylene mesh caused the harm and injuries suffered by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful cause of her injuries at an earlier time because the injuries were caused without perceptible trauma or harm and, when the injuries were discovered, their cause was unknown to Plaintiff.  Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the wrongful nature of the conduct causing the injuries, until less than the applicable limitations period before the filing of this Complaint.  Moreover, Plaintiff was prevented from discovering this information sooner because Defendants misrepresented and concealed, and continue to misrepresent and conceal to the public and the medical profession, the dangers of polypropylene mesh, as well as the true facts that could have led Plaintiff to discover a cause of action against Defendants for their wrongful conduct.

## FIRST CAUSE OF ACTION

## STRICT LIABILITY – FAILURE TO WARN

31.     Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

32.     Defendants designed, manufactured, distributed, promoted, marketed and sold the polypropylene mesh and it was expected to reach, and did reach, physicians and consumers, including Plaintiff, without substantial change in the condition in which it was sold.

33.     The polypropylene mesh manufactured, distributed, promoted, marketed and sold by Defendants was defective and dangerous at the time it was placed in the stream of commerce because of the lack of appropriate and necessary warnings of known or knowable dangers.

34.     The absence and inadequate warnings include, but are not limited to, the following:

   a.   the danger of mesh to contract, shrink, expand, swell and/or deform after implantation;

   b.   the danger of mesh to degrade, fragment and creep after implantation;

   c.   the danger of mesh erosion, extrusion and/or migration;

   d.   the inability to withstand mechanical stress after implantation;

   e.   the lack of biological inertness of polypropylene mesh;

   f.   the danger of chronic inflammation, granuloma formation and foreign body cell reaction;

   g.   the danger of chronic infections;

   h.   the danger of permanent scar tissue formation and sclerosis;

   i.   the danger of the recurrence of hernia;

   j.   the danger of inguinodynia, or chronic groin pain;

   k.   the danger of mesh coming into contact with nerves and nerve damage;

   l.   the danger of organ damage;

m.  the danger of spermatic cord damage and testicular pain;

n.  the danger of pain during sexual intercourse and sexual dysfunction;

o.  the danger of autoimmune disease;

p.  the potential for revision surgery following implantation;

q.  hernia repair with mesh is no more effective than other alternative hernia repair;

r.  the difficulties of removing mesh from the body following implantation;

s.  the danger of leaving residual mesh in the body after implantation;

t.  the substantial impairment of the quality of life following mesh implantation.

35.  The polypropylene mesh manufactured, sold, distributed and promoted, by Defendants was defective due to inadequate post-marketing warnings and/or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of polypropylene mesh, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

36.  Plaintiff and her physicians used the polypropylene mesh as directed for its intended purpose in hernia repair.  Defendants knew that the device would be used by consumers, such as Plaintiff, without inspection for defects, and Plaintiff and her physicians did not know, and had no reason to know, of the existence of the above defects.

37.  The polypropylene mesh was not altered or modified in any way before in was implanted in Plaintiff.

38.  As a direct and proximate result of the above defects and substantial dangers in the polypropylene mesh, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss, and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION

## STRICT LIABILITY – MANUFACTURING DEFECT

39.     Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

40.     Defendants designed, manufactured, distributed, promoted, marketed and sold the polypropylene mesh, and it was expected to reach, and did reach, physicians and consumers, including Plaintiff, without substantial change in the condition in which it was sold.

41.     The polypropylene mesh manufactured, distributed, promoted, marketed and sold by Defendants was defective and dangerous at the time it was placed in the stream of commerce with respect to manufacture because it deviated materially from Defendants' design and manufacturing specifications in such a manner as to make it unreasonably dangerous for its intended use.

42.     Plaintiff and her physicians used the polypropylene mesh as directed for its intended purpose in hernia repair.  Defendants knew the device would be used by consumers, such as Plaintiff, without inspection for defects, and Plaintiff and her physicians did not know, and had no reason to know, of the existence of the above defects.

43.     The polypropylene mesh was not altered or modified in any way before it was implanted in Plaintiff.

44.     As a proximate result of the above defects and substantial dangers in the polypropylene mesh, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss, and will continue to suffer such harm, damages and losses in the future.

## THIRD CAUSE OF ACTION

## NEGLIGENCE

45.     Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

46.     At all times herein mentioned, Defendants had a duty to exercise reasonable care to manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, prepare for use, sell and adequately warn of the risks and dangers of polypropylene mesh.

47.     At all times herein mentioned, Defendants negligently, carelessly, recklessly and/or maliciously manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, tested, distributed, marketed, labeled, packaged, prepared for use, sold polypropylene mesh, and negligently, carelessly, recklessly and/or maliciously failed to adequately warn of the risks and dangers of polypropylene mesh, and to adequately provide post-marketing warnings of such risks and dangers.  Defendants breached their duty by:

   a. Failing to design the polypropylene mesh so as to avoid an unreasonable risk of harm to persons in whom the device was implanted, including Plaintiff;

   b. Failing to manufacture the polypropylene mesh so as to avoid an unreasonable risk of harm to persons in whom the device was implanted, including Plaintiff;

   c. Failing to use reasonable care in the testing of the polypropylene mesh so as to avoid an unreasonable risk of harm to persons in whom the device was implanted, including Plaintiff;

   d. Failing to use reasonable care in inspecting the polypropylene mesh so as to avoid an unreasonable risk of harm to persons in whom the device was implanted, including Plaintiff;

   e. Otherwise negligently designing, manufacturing, distributing, promoting, marketing and selling polypropylene mesh.

48.     Defendants also negligently failed to warn or instruct Plaintiff and her physicians as set forth above in this Complaint.

49.     Despite the fact that Defendants knew or should have known that polypropylene mesh caused unreasonable and dangerous risks and complications, and failed to warn of those risks and complications, Defendants continued to market polypropylene mesh to consumers including Plaintiff.

50.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of the failure of Defendants to exercise ordinary care as described above.

51.     The negligence of Defendants was a proximate cause of Plaintiff's injuries, harm economic and non-economic loss which Plaintiff suffered, and will continue to suffer, as described herein.

## FOURTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY

52.     Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

53.     Before polypropylene mesh was implanted in Plaintiff, Defendants impliedly warranted to Plaintiff, and her physicians, that polypropylene mesh was of merchantable quality, adequately contained, packaged and labeled, and safe and fit for the use in hernia repair.

54.     Plaintiff was and is not inexperienced in the research, design, manufacture, sale and distribution of medical devices such as polypropylene mesh, and reasonably relied upon the

skill, judgment and implied warranty of the Defendants in undergoing hernia repair surgery with polypropylene mesh.

55.     Polypropylene mesh was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, since it causes serious medical problems and complications when used as intended and will cause injury to consumers who undergo hernia repair with polypropylene mesh.

56.     As a result of the breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as herein alleged.

### FIFTH CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

57.     Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

58.     At all times herein mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, healthcare providers, medical patients and the general public, that polypropylene mesh is safe, effective, fit and proper for its intended use in hernia repair.

59.     In implanting polypropylene mesh for hernia repair, Plaintiff relied on the skill, judgment, representations and foregoing express warranties of Defendants.  These warranties and representations were false in that polypropylene mesh is unsafe, unfit and ineffective for its intended purpose in hernia repair as described in this Complaint.

60.     As a result of the breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.


## SIXTH CAUSE OF ACTION

## FRAUD

61.     Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

62.     Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed polypropylene mesh, and up to the present, willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning polypropylene mesh, which the Defendants had a duty to disclose.

63.     At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of polypropylene mesh and willfully deceived Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using polypropylene mesh for hernia repair.  Defendants knew of the foregoing, that polypropylene mesh is not safe, fit or effective for human implantation, that undergoing implantation with polypropylene mesh is hazardous to health, and that polypropylene mesh has a serious propensity to cause injuries and harm to consumers, including but not limited to the injuries Plaintiff suffered.

64.     Defendants suppressed and concealed the true facts concerning polypropylene mesh with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff's physicians

would not have used, and Plaintiff would not have undergone implantation with, polypropylene mesh if she was aware of the true facts concerning its dangers.

65.     As a result of Defendants fraud and deceit, Plaintiff suffered the injuries and damages as herein alleged.

## SEVENTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

66.     Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

67.     From the time polypropylene mesh was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to misrepresentation that polypropylene mesh was safe, fit and effective for use in hernia repair.   At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of polypropylene mesh and willfully deceived Plaintiff, Plaintiff's physicians and the general public as to the health dangers and consequences of the use of polypropylene mesh in hernia repair.

68.     The Defendants made the foregoing misrepresentations without any reasonable ground for believing them to be true.   The representations were made directly by defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance, and the purchase and use of polypropylene mesh for hernia repair.

69.     The representations by the Defendants were in fact false, in that polypropylene mesh is not safe, fit or effective for use in hernia repair, using polypropylene mesh is hazardous to health, and polypropylene mesh has a serious propensity to cause injuries to consumers, including but not limited to the injuries suffered by Plaintiff.

70.     The above representations by Defendants were made with the intention of inducing reliance, and the purchase and use of polypropylene mesh for hernia repair by Plaintiff.

71.     In reliance on the misrepresentations by the Defendants, Plaintiff was induced to use polypropylene mesh for hernia repair.  If Plaintiff had known the true facts and the facts concealed by Defendants, Plaintiff would not have used polypropylene mesh.  The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and carried out by individuals and entities that were in a position to know the true facts.

72.     As a result of the above negligent misrepresentations by Defendants, Plaintiff suffered the injuries and damages as herein alleged

## PUNITIVE DAMAGES ALLEGATIONS

73.     Plaintiff incorporates by reference herein all of the above allegations in this Complaint as if fully set forth herein.

74.     The acts, conduct and concealment of Defendants, as alleged in this Complaint, were willful, malicious, oppressive and fraudulent.  Defendants committed these acts with a conscious disregard for the rights and safety of Plaintiff and other consumers, and for the primary purpose of increasing Defendants' profits from the distribution and sale of polypropylene mesh.  Defendants' outrageous and unconscionable conduct warrants the

imposition of punitive damages against Defendants in an amount appropriate to punish and deter such conduct in the future.

75.     Before the manufacture, promotion, distribution and sale of polypropylene mesh to Plaintiff, Defendants knew that it was in a defective condition and knew that they had made a strategic decision to fraudulently represent and intentionally conceal the significant risks and serious dangers of polypropylene mesh, as described in this Complaint, and knew that consumers, including Plaintiff, who used polypropylene mesh for hernia repair would, and did, experience severe physical, mental and emotional injuries.  Further, Defendants, through their officers, directors, managers and agents, knew that polypropylene mesh presented a substantial and unreasonable risk of harm to the public, including Plaintiff.  Thus, Defendants unreasonably, maliciously, oppressively and fraudulently subjected consumers of polypropylene mesh, including Plaintiff, to the risk of serious injury.

76.     Despite their knowledge, Defendants, acting through their officers, directors and managing agents for the purpose of enhancing the profits of Defendants, knowingly and deliberately failed to remedy the known defects in polypropylene mesh and failed to warn the public, including Plaintiff, of the serious risk of injury caused by the defects in polypropylene mesh.  Defendants and their officers, directors and managing agents, intentionally proceeded with the manufacture, sale, distribution and marketing of polypropylene mesh knowing these actions would expose consumers, including Plaintiff, to serious danger in order to advance Defendants' financial interests and increase revenue.

77.     Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with

willful and conscious disregard for the rights and safety of Plaintiff and other consumers, thereby

entitling Plaintiff to the imposition of punitive damages.


**WHEREFORE,** Plaintiff pray for judgment against the Defendants, as follows:

1.  General damages, according to proof;

2.  Special damages, according to proof;

3.  Loss of earnings and earning capacity, according to proof

4.  Medical expenses, past and future, according to proof;

5.  Mental and emotional distress, past and future, according to proof;

6.  Punitive damages, according to proof.

7.  Costs of suit herein;

8.  Pre-judgment and post-judgment interest, as provided by law; and

9.  Such other and further relief as the Court may deem just and proper.

## PLAINTIFF'S DEMAND FOR TRIAL BY JURY

Pursuant to rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demand a trial by

Jury with respect to the claims and relief set forth herein.


Respectfully submitted,

/s/ *Jeffrey D. Ries*
Jeffrey D. Ries, Esq.
Attorney for Plaintiff
Pa. I.D. No.:  311901

**Certificate of Service**

I, Jeffrey D. Ries, Esquire, hereby certify that a true and correct copy of the within Civil

Complaint was mailed this 23rd day of June, 2015 by First Class Mail and Certified Mail, to the

following:

Jason D. Strabo, Esquire
McDERMOTT, WILL & EMERY
2049 Century Park East, 38th Floor
Los Angeles, CA 90067-3218
*Counsel for Premier Healthcare Alliance, L.P.*

Karen Palladino Ciccone, Esquire
AKERMAN, LLP
725 South Figueroa Street, 38th Floor
Los Angeles, CA 90017-5433
Karen.ciccone@akerman.com
*Counsel for Atrium Medical Corporation; Getinge Group; Getinge USA, Inc.; Maquet*
*Cardiovascular, LLC d/b/a Maquet Cardiovascular US Sales, LLC; d/b/a Maquet Medical*
*Systems USA.*

*/s/Jeffrey D. Ries*_____
Jeffrey D. Ries, Esquire
*Counsel for Plaintiff*